Thank you. My name is Mark Goodman. I represent the appellate Ryan Andrew Krause. Ryan's father, Dre Krause, was shot and killed by a Mohave County Sheriff's Deputy, by the name of Jordan Selman, on February 13, 2017, in Topox, Arizona, near the intersection of Interstate 40 and the Colorado River. Dre's mother brought this action, pursuant to 14 U.S.C. section 1983 state law, alleging that Deputy Selman had used excessive deadly force when he shot and killed Dre. This appeals from the District Court's summary judgment in favor of all defendants. The tale in the origin of this case is that immediately after the shooting, Selman soon told Detective Slack that Dre exited his home and was, quote, facing, end quote, Selmanson when the shooting occurred. But the autopsy and other physical evidence showed that Dre was shot on his left side with the bullets traveling from north to south. And if Dre had exited his home and was facing Selmanson, the bullets would have entered him from his front, not from his left side. Mr. Goodman, didn't you have an expert, a ballistics expert, who was excluded? So you don't have an expert offering any qualified testimony about point of entry, exit, etc., how Mr. Krause would have been standing, how the detective, or rather Officer Selmanson, would have been standing. Is that true? I mean, it sounds to me like what we have is your argument absent your expert. The medical examiner determined where the bullets entered. And there were two bullets that entered. One remained in the body. The medical examiner determined the path of the bullet through the body. The medical examiner determined that the second bullet passed through Mr. Krause's right thigh, from his inner right thigh, traveling towards his right side, and exiting on the right side of his right thigh. Okay. Well, did you have an expert that testified to where he would be standing? I mean, you could shoot somebody in the right thigh, and they could twist him to do the other shot, and vice versa. Did you have any expert saying, this is where he was standing, and this was his posture when he was shot? So there's a dispute in the evidence in the record about where Dre was standing when he was shot. The second deputy, who was downrange and looking back north, north towards where Selmonson was standing, he testified that Dre never came out of the residence before he was shot. Deputy Selmonson testified that Dre came out of the residence before he was shot. The porch light was on, and so if Dre had come out, he would have been seen. So there's a dispute in that evidence. Deputy Selmonson testified that— Okay. I take it by your silence on this issue there was no expert as to where he was standing or his posture when he was shot. Go ahead. I'm sorry. Okay. My hesitancy is I don't know that I necessarily agree with that. I was trying to think of the evidence in the record that would answer your question directly. Let me continue. Selmonson, by his own admission, was one or two feet from the wall of the building, and anywhere from six to 10 or 12 feet north of Dre when he shot him. He fired three shots in rapid succession. One bullet went south, entered the garage at the level of about Deputy Schiller's head. And Selmonson's diagram photographs the bullet wound locations, the garage bullet hole locations. Selmonson's drawing of an X next to his initials, all those things demonstrate the bullet trajectory. You don't need an expert to determine which way the wind blows. You don't need an expert to determine the trajectory of the bullet. When the shooter is standing north and firing towards the south, you know that the bullets are going to go from north to south. So, Mr. Goodman, this argument or your argument focuses on a few points, whether Mr. Krause had stepped out of his home or whether he was still in the home, how he was standing, whether he was facing the officer or not, and there was something else that you were arguing about, whether he'd raised the gun or pointed the gun. I mean, basically, it seems to me that whether he had stepped out of the trailer or was still in the trailer, whether he was canted to the left, as the officer says, or straight on. I mean, what we're really trying to figure out is, was it objectively reasonable for the officer to use deadly force in these circumstances? So how do all of these factors, all these different issues that you're arguing about, if we credit all of them aside, yes, you're right, he hadn't stepped out of the trailer. He was turned a certain direction. How does all of that affect whether the officer's decision was objectively reasonable? Because there are facts that demonstrate that the officer was not telling the truth when he said that he was afraid for his life, and that's why he shot. There's facts, admissible facts in the record that show that the decedent could not have been facing the officer. He was looking towards the east, and the officer was to his left, which was on the north. I guess the issue is there's no indication that the gun was going anywhere but to the officer. I'm sorry, it was going anywhere? That Mr. Krause's gun was pointed anywhere, was about to be pointed anywhere other than the officer, no matter which the angle of his body was at the time. There is evidence contradicting that, and that evidence is that the officer could not see Trey's right hand, which supposedly was on the trigger. His left hand was on the barrel of the shotgun. His right hand was on the other side, and he couldn't see it. If Trey had been facing him, if you're facing somebody and pointing a weapon at them, you're going to see the right hand where the trigger finger is. I just don't know if that's the case. I'm just not understanding the argument, because people hold rifles in different ways. They can be tilting their body one way or the other, and the hand can be obscured. The fact that he had already been called out there because of a shot fired, and there was already clearly a dangerous situation, it seems to me that there may be concern with your argument.  What I'm arguing to you, suggesting to you, is admissible evidence in the record that contradicts the officer's account. A jury could have believed the physical evidence which contradicts the officer, and could have believed the pre-litigation statement made by the other officer to the investigating detective. The jury could infer from all of those other facts that the officer wasn't telling the truth, that he was not in danger because the firearm wasn't pointed at him. Trey wasn't facing him. The firearm was coming up, but it was directed towards the east, not towards the north. I want to make sure I understand your argument. He was inside the trailer? He was standing barely inside, either inside or at the threshold, is that correct? Before he was shot, and our argument is also when he was shot. Right. And there was no one else there? Is that correct? Well, the two officers were there. Trey was there. His mother was inside, hard of hearing with the TV turned up louder. So she had no idea what happened. All right. Did the officer know that he was intoxicated? No. He said he did not. Okay. So is there anything else he would be possibly wanting to point the gun at? I'm sorry, point? Is there anything else that he would want to point the gun at, other than the officer who was standing there? Well, you're assuming that he wanted to point it at the officer. I know, I'm making an assumption. Assuming that he was thinking about firing the gun. Was there any other conceivable target? Well, he wasn't thinking about firing the gun because it was a single shot shotgun. And the only cartridge in it had already been discharged. And it was his mother's shotgun. And presumably he knew he could only fire once. It had already been fired. Couldn't be fired again. And our argument is he wasn't pointing it. He was raising it to hand it to the officer. And he was drunk. Do you have any evidence to that effect? That he was raising it to hand it to the officer? Or is that just your argument? It's an argument based on the fact that the barrel of it was coming up. And that he was inside the residence facing east. Not facing the officer. And he was drunk and he was slow to react. Mr. Goodman, you're just under three minutes. Did you want to reserve your time? Yes, thank you. Mr. Ackerman, whenever you're ready. Good afternoon, your honors. My name is Justin Ackerman and I represent the County of Mojave, Jordan Sellinson, and Richard Schiller in this matter. Let me start off with the speculative theory of handing the gun over. The undisputed evidence in the record is that not only were officers summoned to this residence for what was believed a shot that had originated from Mr. Krause's house against a neighbor. But also that they were in full uniform. They had not been announced twice that they were from the sheriff's office. And that when Mr. Krause opened his door, not only did he have his shotgun in hand, but he raised it on two occasions despite loud, clear commands from the officer to drop the weapon. In addition, it's also undisputed that not only did he raise the weapon, he gripped it with both hands. If he's going to hand his gun to the officer, he's certainly not going to raise it in defiance of his commands to drop the weapon and then also grip it with both hands. It's simply speculation on my opponent's argument. With regard to a few of the other issues that have been raised, Officer Salmonson is the only person who observed the actions of Mr. Krause in the immediate moments before he fired his weapon. There are no eyewitness testimonies of the contrary. And with regard to Officer Schiller, who was on scene, his testimony in the record is absolutely clear that he, from the moment he saw the barrel protrude from the doorway  when he's in motion, he's running from one point of the area to the other to try and find cover. In fact, his testimony is clear that when the shots were actually fired, his back was towards both Officer Salmonson and Dre Krause. So his testimony in no way can contradict Officer Salmonson's observations because he was not within the same perspective from what Officer Salmonson was at. With regard to the fact that Officer Salmonson could not, he testified he did not see Dre Krause's right hands, that's because his testimony was unequivocal and understandable that the moment he saw a shotgun barrel protrude from the doorway, that was his focus. He testifies no less than seven or eight times in the record, and I'm happy to give the court the sites that they wanted, that that was his sole focus. And it's completely understandable as an officer coming on scene to a residence where you're suspected of having shots fired from it that you see a gun, that's your focus. So the fact that Salmonson testified he didn't notice where Dre's right hands were in no way contradicts the uncontested record of the shotgun being raised twice in defiance of his commands or that it was being pointed at him. And again, it's speculation to argue otherwise. Now, with regard to my opponent's argument that Mr. Krause was shot on the left-hand side of his body and therefore he had to have been facing east directly out of his doorway, that's a mischaracterization of the record in the medical examiner's report. What the medical examiner's report actually found, and this is at ER 496, is that Mr. Krause was shot five and one-fourth inches to the left of the interior midline. And I wish I was in person before the court to show this a little bit better, but that's roughly here. It's not on the exact side of Mr. Krause, which is entirely consistent with Mr. Krause exiting his residence and facing Officer Salmonson in a bladed stance, which was his testimony. So the medical examiner's report actually corroborates and does not contradict Officer Salmonson's testimony. To further protest that, the medical examiner herself testified she could not tell from the autopsy that she performed, she could not give the orientation or the spacing of the parties. She could only tell where the entrance wounds were. So that in no way contradicts Officer Salmonson's account of the circumstance in any way. And as the court had already noted, the fact that there's no ballistics expert from opposing counsel to support any of these theories whatsoever should end the argument right there. And just for the court's edification, if the court were to look at United States v. Johnson, that's 874F.3D1265, that case was cited in the district court's decision striking Mr. Goodman's expert, saying that you must have a ballistics expert to give these kinds of evidentiary testimony. And just to remind the court, plaintiff's expert was trained in firearms but not in ballistics. And so the argument that a layperson could somehow find an issue of fact without the aid of expert testimony in this particular regard is improper to be made at this point in the record, especially since Mr. Goodman has not raised the trial court's ruling on his expert as an issue on appeal. And I would also add that defendant's expert, Luke Haag, on all these issues is uncontested, and in particular his report at ER 421. So what the court is left with is a situation where Dre Kraus was reported to have fired a gun at his neighbor. Officers responded on scene. They were reactionary in every way to Mr. Kraus's actions, and Mr. Kraus escalated his conduct at every step of the way despite multiple warnings to drop his gun and despite efforts by the officers to not resort to deadly force. And in fact, they were required to. Mr. Ackerman, what is your response to the suggestion we've heard that the officers should reasonably have known that the gun was no longer loaded? Well, the officers didn't know that at the time, so the court must have. I'm sorry, go ahead. The argument was that they should have known because if he's just fired it, there wouldn't be another bullet in it. Well, that would be speculative on the assumption that it wasn't reloaded after it was fired, and there's no evidence in any way whatsoever. So I think an officer who has a gun pointed towards them is not required to do the calculation of, this gun was fired 30 minutes before I arrived, and was it loaded or not? That's not what this court has ever required the officers to do. What about not warning him? I think the testimony was that he commanded, the officer commanded Mr. Cross to drop the gun loudly a couple of times, but I don't think there's any testimony that he warned him of the consequences if he didn't. Is there any practical reason that the officer couldn't have warned Mr. Cross what would happen if he didn't drop the gun? Well, the undisputed testimony is from the moment the door was opened, it was mere seconds between when the gun was raised, commands were given, and then shots were fired. I think my opposing counsel is splitting hairs by saying a warning wasn't given when an officer commands somebody to drop the weapon. It would require almost superhuman reaction time to say drop the weapon or I will shoot you. I'm not aware of any case, and there's none cited in the briefing, that requires that specific of a warning, and I think the order, the repeated commands to drop the weapon was the warning. Our case law says you have to give a warning whenever it's practicable. So as I understand it, your argument is it wasn't practicable because of the short period of time at issue? That's correct. It wasn't practical, but to the extent that the court is looking for the evidence in the record of actions undertaken by Officer Sellinson before he discharged his weapon, he did give repeated commands to drop the weapon. It's not as if he just waited for Cross to raise the gun, said nothing, and then shot. And that's a big distinguishment from some of the other cases that have been cited. And so in that regard, I would point the court to the George B. Morris case, which recognized that if the person is armed or reasonably suspected of being armed, a furtive movement, harrowing gesture, a serious verbal threat might create the immediate threat that would justify the use of force. So even the movement of the gun after the commands were given was sufficient. I would also point the court to the Casella case, which just came down in 2018 from the Supreme Court. To remind the court briefly of those facts, the individual was suspected of— there were multiple 911 calls that an individual was armed with a knife in a neighborhood. She was stabbing a tree and just sort of having errant behavior in the neighborhood. Officers arrived on scene, and she was merely standing at a fence line with her neighbor next to her on the other side. And officers gave her two repeated commands, just as in this case, to drop her knife, and she refused. And at that point, the officer fired upon her four times. And the court found that that was—in the context of qualified immunity, there was no case that put the officers on notice that that conduct would have violated that person's Fourth Amendment rights. So there are multiple cases that demonstrate the refusal to comply with officer commands when the presence of deadly force exists would justify the use of force in this situation. And let me touch on qualified immunity for a moment. There is no other case. There's none cited by Mr. Goodman, and Mr. Goodman's briefing admits it. They have similar facts. And again, Casella makes absolutely clear in this context that you must have a specific fact— to put the officer on notice that his acts would violate a constitutional right of the individual. There are none with similar facts here, and I would submit to the court that there was not a constitutional violation in the first place. But even if somehow Mr. Goodman could prove one, even on the facts as he asserts them, under the case I just referenced, there would be no constitutional violation. Let me touch briefly on the other claim that has not been discussed, unless the court has any questions at the moment. The denial of medical care claim. The Maddox case and the Tatum case clearly say that all an officer has to do after a use of force has occurred is to either apply aid or summon the necessary aid to treat the individual. And the record here is undisputed. Within one minute of the shooting, EMS was called. Within eight minutes, they arrived and treated. The record is also undisputed that no amount of medical care could have saved Mr. Krause. So not only did the officers comply with their constitutional requirements to summon aid, but there was nothing they could have done to save him. So the plaintiff cannot meet the causation requirements of a 1983 denial of medical care claim because there was nothing they could do to save Mr. Krause. And I'll just tack on to that, again, qualified immunity under Maddox and Tatum further support the trial court's ruling granting summary judgment on the denial of medical care claim. The last thing I'll say, Your Honors, is that the state law claims, for all the same reasons, fail as the Fourth Amendment seizure claim. Unless the court has any other questions for me, I'll rest. Thank you, Your Honors. Thank you, Mr. Ackerman. Mr. Goodman, let's get your time back on the clock. It looks like we're ready. Please go ahead. Thank you, Your Honor. The Mojave County Sheriff's Office policy, written policy, was the deputies were required to administer aid, not just summon it. So they were required to administer aid. They didn't. Well, police policy doesn't create a constitutional right, does it? It creates a duty for the officer. But we're talking, this is a constitutional case, right? I understand, but the duty translates into the violation of the constitutional right here.  I do not, Your Honor. Okay. Not causation regarding death, but causation of any injury. And lying there after having been shot, having asked for help, is certainly an injury. The medical examiner was a man, not a woman. There was no warning. There were commands anywhere from three to five, depending upon which assailants and versions you believe, a warning to drop a gun, but no warning that he would be shot if he didn't comply. The location of the bullet entrance wound on the left side is consistent with Mr. Krause standing inside the doorway, and the officer being a couple of feet to the east, standing inside the garage. Deputy Schiller's deposition was contradicted by his statements in Detective Slack before the lawsuit was filed. And Solomonson's own admission demonstrates that his decision to shoot was objectively unreasonable. He knew where Schiller was and what Schiller was doing. He knew that Schiller was in the line of fire. He knew that it was not reasonable to discharge a firearm in the direction of another peace officer. And despite all of those things, he discharged his weapon. His decision-making process was, it was objectively unreasonable. So for those reasons, we ask you to reverse and remain. Thank you. Thank you, Mr. Goodman. All right, we'll take this case under submission. The other cases that were on the calendar for today were submitted on the briefs or argument was vacated. So we will adjourn for today. Thank you, counsel. Thank you, Your Honor. Thank you, Your Honor. This court for this session stands adjourned.
judges: Schroeder, Jack, Bade